## MENGEL BODY CO. v. HUMIDITY CONTROL CO.

Circuit Court of Appeals, Third Circuit.
July 24, 1929.

Rehearing Denied September 3, 1929.

No. 4011.

Backes & Backes, of Trenton, N. J., Ralph G. Lockwood and Virgil H. Lockwood, both of Indianapolis, Ind., for appellant.

Briesen & Schrenk, of New York City (Hans v. Briesen, of New York City, G. B. Schley, and V. A. Trask, both of Indianapolis, Ind., of counsel), for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. This case involves patents for apparatus and process for drying lumber. The artificial drying of lumber, the status of such art, and the improvement thereon are all discussed in the opinion of Judge Bodine, the important parts of which are printed in the margin.[1] His statement is so complete and his reasoning so convincing that this court can rest thereon. Indeed an additional opinion could be little else than an attempt to put into other language what he has so well said. We therefore adopt his opinion as expressive of our own, and limit ourselves to affirming the decree below.

In doing so we note that, as the kiln-drying of lumber progressed, the various elements of benefit and injury, of varying elements in different kinds of lumber, woods of varying thickness, and generally of all factors concerned, became so accurately known as to result in tables of "safe" drying figures which were the accepted guides in scientific kiln-drying. These schedules showed what temperatures and relative humidities should be maintained and the maximum temperatures and the minimum humidity which should not be passed. Based on these schedules, the art regarded it as dangerous to raise the temperature higher or to lower the relative humidity below what the schedule made the path of safety. In carrying on this practice the aim was to maintain throughout the drying operation a given humidity and a given temperature. Continuity and relativity of such determined conditions throughout the process was the goal sought.

From this schedule of safety, the Krick patents departed and followed virtually an opposite course, in that it, leaving the maintained scheduled path of safe humidities and temperatures, they went outside and at frequent but restricted intervals lowered the relative humidity. We say at restricted intervals, for, if such lowered condition was maintained,

---

[1] Bodine, District Judge. The patents in suit are the Krick process patent, No. 1,490,569, and the Krick apparatus patent, No. 1,513,727. Both relate to the kiln-drying of lumber. Lumber, in the early days, dried where it fell. Then it was dried in open sheds. These processes were slow, and for many years it has been dried in kilns. The humidity in the kiln was increased by steam. If there is no moisture present, case hardening occurs, and the lumber is useless.

Krick found that by raising and lowering the relative humidity (moisture) the best results were obtained in less time. A kiln operator for Steinway & Sons, makers of pianos, testified that by using Krick's process and apparatus he had cut the drying time in half and had obtained better lumber than he had ever had before. The lumber he dried was easier to tool, and was much better suited for fine cabinet work.

\* \* \* \* \* \*

Broadly, the patentee claims a monopoly for dry kiln operations by alternately raising and lowering the humidity of the air between wide limits; the raising and lowering being to materially higher and lower limits than the mean relative humidity. The low limits are far below a value which would otherwise be safe, and the raising is much more rapid than the lowering.

\* \* \* \* \* \*

In the defendant's apparatus, a clock turns on and off the steam spray at stated intervals, thus raising and lowering the relative humidity with more rapid raisings than lowerings. The defendant's device takes the drying to the high and low points of relative humidity. In fine, the defendant accomplishes, by means of the clock, the same result obtained by the plaintiff's apparatus. The relative humidity of the air in the kiln is alternately lowered and raised. The range is wide. The low range would, if continued, destroy the lumber. He does precisely the same thing that the plaintiff accomplishes by its timing device, which is responsive to the dry bulb and wet bulb temperature in the kiln. The plaintiff's device turns off and on the steam. The defendant, by the clock, accomplishes the same result.

The plaintiff's apparatus claims are, of course, limited to a control means arranged to shift at

it would injure the lumber, but its intermittence gave an increased drying power which more rapidly drew the interior moisture from the wood. After a determined time the relative humidity was again raised by turning on for a short time a steam spray. The functional difference between the two practices is we think well stated in counsel's words as follows:

"The old practice *maintained* the safe relative humidity of the schedule at least as high as the schedule called for throughout the entire drying operation; *and merely raised it higher* by occasional steam sprays, with never any lowerings below the normal safe relative humidity called for by the schedule. It provided no increased drying power whatever.

"The Krick process, on the other hand, intermittently lowers the relative humidity well below the safe schedule, but intersperses those intermittent lowerings with intermittent raisings of the relative humidity which prevent injury to the wood."

The decided advance made thereby in the lumber drying art is already stated in Judge Bodine's opinion.

The other points raised have been duly considered, but, finding no errors in the decree below, it is affirmed.

---

each operation the relative humidity value. The defendant, having predetermined the time for shifting, accomplishes the same result by his clock. When the humidity is too high, the steam is shut off and similarly when too low the steam is again admitted.

The claim is made that the defendant's operation is merely that of the prior art, but it is more closely that of the plaintiff's patent. The plaintiff has automatic means, but the result of the automatic means is produced by the defendant's clock mechanism. The successful limits of high and low relative humidity, once determined, can be charted and worked out and repeated by means of the clock.

The life of the patent is in the method rather than in any particular device—one device will serve as well as another. If Krick was an inventor, his invention is in the method rather than in the precise apparatus he employs. If the moisture in a piece of wood is too rapidly drawn off, the surface dries long before the interior and the drying of the surface prevents the interior moisture from escaping—hence warping occurs.

In the prior art, the lumberman added steam according to schedule as he thought it necessary, and certain kinds of wood were dried in certain ways according to schedule. Air to dry must be capable of absorbing moisture.

Below 212 degrees F. air can absorb only a certain amount of moisture. If the air is saturated it will not dry; if its relative humidity is below saturation point it will absorb moisture until it reaches the saturation point. Above 212 degrees F. there is no limit to the amount of moisture that can be mixed with air; hence there is no relative humidity above that point. The lower the relative humidity, the greater avidity for moisture, and hence the greater drying power.

In Krick's apparatus, the relative humidity of the air in the kiln is determined by comparison of the readings upon a dry bulb and wet bulb thermometer. His method uses the high limits which were thought unsafe in the prior art and the low limits beyond which no one permitted the temperature to drop.

The prior art fixes the heat and the relative humidity along definite lines. The Krick process is constantly in change. He goes to high limits and then to low limits. There is a constant fluctuation up and down.

The claims of the process patent are perfectly definite and certain. He does state what he did in relative terms, and the English language admits no greater certainty. The charts made from defendant's operation, when compared with the charts made from Krick's operation, show that precisely the same results are obtained. The novelty is in going above the high limits and going below the low limits—carrying on the drying process with constant changes of the relative humidity."