## HUMIDITY CONTROL CO. v. MENGEL BODY CO.

District Court, D. New Jersey.
Sept. 23, 1935.

Briesen & Schrenk, of New York City (Hans V. Briesen, of New York City, and G. B. Schley, V. A. Trask, and T. P. Jenkins, all of Indianapolis, Ind., of counsel), for plaintiff.

Backes & Backes, of Trenton, N. J. (Virgil H. Lockwood, Ralph G. Lockwood, Elmer L. Goldsmith, and Thomas B. Huestis, all of Indianapolis, Ind., of counsel), for defendant.

FORMAN, District Judge.

Suit was brought by the plaintiff to enjoin the defendant from its patents No. 1,490,560 and 1,513,727 through the use of a lumber drying process and apparatus called a "Cyclspray," allegedly invented by one Frederick W. Rubin, and manufactured and sold to the defendant by the Kiln Supply & Manufacturing Company. The plaintiff's apparatus and process was invented by Arthur E. Krick and is known as a Moistat. This was held to be infringed by the defendant in an opinion by Judge Bodine, then of this court, filed September 18, 1928, and affirmed in the opinion 34 F.(2d) 81 by Judge Buffington of the Third Circuit Court of Appeals filed July 24, 1929.

The cause was referred to Frederick Frelinghuysen, Esq., as master, with instructions to take and state the amount of gains, profits and advantages derived, received, and made by the defendant by reason of the infringement, and to assess the damages sustained by the plaintiff. Testimony was taken before him and he filed his report on June 21, 1933. (The clerk's file date appears as January 19, 1934.) The report is in two sections—a main report and a supplementary report. The main report indicates a finding upon the part of the master of $6,216.23 in favor of the plaintiff. In the supplementary report he found in favor of the plaintiff in the sum of $30,259.95 in the event of the use of an alternative method of calculation.

Defendant is engaged principally in the manufacture of automobile bodies and utilizes therein large quantities of seasoned lumber. Quoting from the master's report "the seasoning is done by applying steam to green lumber in kilns to hasten the drying and at the same time to prevent warping. It had dried lumber by steam for a considerable time prior to the periods in question; several devices had been used with varying success and in October, 1926, in an effort to increase the efficiency of its kilns, it purchased a Cyclspray, which was installed in one of its twelve kilns. After operating for several months it was considered successful and in April, 1927, five more Cyclsprays were ordered. On June 1, 1927, plaintiff, through its attorneys, notified defendant that these Cyclsprays infringed its patents. Defendant, however, proceeded with their installation and on August 1, 1927, six of its twelve kilns were equipped with Cyclsprays and in operation. It continued to use them until October 23, 1928, when enjoined by the interlocutory decree in this cause. There is, therefore, a period of twenty-four months during which the defendant operated Cyclsprays and for which the benefits realized by the defendant must be determined. For convenience, it has been divided into two periods, designated (by agreement of counsel) as Period I—November 1st, 1926 to July 31st, 1927, (the nine months during which one Cyclspray and eleven Non-Cyclsprays were operated), and Period II—August 1st, 1927 to October 31st, 1928, (the fifteen months during which six Cyclsprays and six Non-Cyclsprays were used)."

Plaintiff filed twenty-three exceptions to the report of the master mainly to the effect that the master did not accept its theory of accounting denominated by it the "Comparison by Inclusive Totals" (and by the master—the "Theory of Expectancy"). The plaintiff contends that under its theory it is entitled to damages in the sum of $69,427.36.

The defendant also excepted to the master's report in that he had erred in

the application of its theory called the Theory of Comparative Efficiency and urges that a proper application of the same would have demonstrated that its Non-Cyclspray equipment was practically as efficient as the Cyclspray equipment, and hence no benefit or profit resulted to the defendant.

The defendant purchased and installed one of the infringing Cyclsprays on November 1, 1926. For nine months thereafter it continued to use this device in one of its kilns and then purchased five more of the same, and for the next fifteen months it operated six of its kilns equipped with Cyclsprays and six of them without such equipment. We will refer to the nine-month period as period I and the subsequent fifteen-month period as period II. During period I the defendant dried a total of 6,383,770 board feet of lumber, being 708,976 feet using one Cyclspray and 5,674,794 feet using eleven Non-Cyclspray units. During period II it dried 15,502,909 board feet, being 8,161,147 feet using six Cyclspray and 7,341,762 feet using six Non-Cyclspray units.

The cost of drying during period I was $24,868.00 and during period II it was $41,413.39.

It was necessary for defendant, from time to time during both periods, to contract to have its lumber dried outside of its own plant, and it is agreed that this was done at a cost of $10.815 per thousand board feet.

During period I the kilns were operated at 66 per cent. of capacity and in period II they were operated at 83 per cent. of capacity.

The plaintiff's computation [1] is contained in Exhibit P-11A and is approach-

---

1 "First Computation.

"The total operating cost for the 12 kilns in the 9-months period is given in the defendant's account as $24,868.00. Therefore, the cost per month during the 9-months period, of operating the 12 kilns, is

$$\frac{\$24,868.00,}{9} \text{ or } \$2,763.11.$$

"The total operating cost for the 12 kilns in the 15-months period is given in the defendant's account as $41,413.59. Therefore, the cost per month during that 15-months period, of operating the 12 kilns, is

$$\frac{\$41,413.39,}{15} \text{ or } \$2,760.89.$$

"Thus the operating cost per month for operating the 12 kilns is substantially identical in the two periods. The difference, $2.22 per month, is negligible in comparison with the monthly cost; and, though favorable to the Cyclspray, may be disregarded.

"Therefore, with the same operating cost per month, the total expected footage in 15 months would be 15/9, or 5/3, of the total footage dried in 9 months; or

(1) 6,383,770 ft. × 5/3 = 10,639,615 ft.

"However, the actual footage obtained in the 15-month period was 15,502,909 feet. In other words, the actual footage obtained shows a gain over the expected footage, said gain amounting to 4,863,294 feet.

"This total increased footage, multiplied by the average increase in value of lumber resulting from its being kiln-dried, taken as $10.815 per M feet, is the measure in money of the benefit derived from the 5 additional Cyclsprays used during the 15-months period. That is:

(2) 4,863.294 M × $10.815 = $52,596.52

"However, this shows only the benefit from the addition of 5 Cyclsprays for 15 months, or from 75 Cyclspray-months.

"There was a sixth Cyclspray that operated for 24 months, making 24 additional Cyclspray-months.

"In consequence, the value given above is to be increased by 24/75. That is:

(3) 24/75 × $52,596.52 = $16,830.84

"This is the benefit derived from the Cyclspray first installed, for the 24 months it was in use. Adding these two amounts:

(4) $52,596.52 benefit from 5 Cyclsprays for 15 months

$16,830.84 benefit from 1 Cyclspray for 24 months

---

$69,427.36 total benefit from Cyclsprays

"This is the money value derived by the Mengel Body Company from its use of the Cyclspray equipment.

"Second Computation.

"The total amount of lumber dried in the 9-months period was 6,383,770 board feet. Dividing this amount by 9, it shows that during the 9-months period, when there was only 1 Cyclspray, lumber was dried at the rate of 709,307.778 feet per month.

"The total amount of lumber dried in the 15-months period was 15,502,909 board feet. Dividing this amount by 15, it shows that during that 15-months period, when there were 6 Cyclsprays, lum-

ed by four methods, two arithmetical and two algebraical, but all of which arrive at a figure within a few cents of the sum of $60,427.36.

ber was dried at the rate of 1,033,527.267 feet per month.

"This greater production was obtained at no greater cost per month; for, as shown in the first computation, the cost per month during the 9-months period was $2,763.11 and during the 15-months period was $2,760.89.

"A comparison of the amounts dried per month during the two periods shows that there was an increased monthly production during the 15-months period. That is:

(5) $1,033,527.267 - 709,307.778 = 324,219.489$ ft.

"This monthly increase with 6 Cyclsprays is 45.7% increase over the monthly production when there was only 1 Cyclspray.

"This increased production per month was due to the addition of 5 Cyclsprays for the 15-months period. Therefore, the benefit from 1 Cyclspray in increased production per month is 1/5 of that amount;

(6) $324,219.489 \div 5 = 64,843.898$ ft. increased production per Cyclspray-month.

"As 5 Cyclsprays were used for 15 months, or 75 Cyclspray-months, and one was used for 24 months, or 24 Cyclspray-months, the total number of Cyclspray months is 99. That is:

(7) $75 + 24 = 99$

"Therefore, the total benefit, expressed in board feet, due to the use of Cyclspray by the Mengel Body Company is:

(8) $64,843.898 \times 99 = 6,419,545.902$ board feet.

"Taking the difference in value before and after drying as $10.815, as before, the value of this increased amount of dried lumber is:

(9) $6,419,545.902 \times \$10.815 = \$69,427.39$

"This is the money value derived by the Mengel Body Company from its use of the Cyclspray equipment.

"Third Computation.

"Let y equal the value per month of the drying operation in one kiln without Cyclspray.

"Let x equal the differential value per month (+ or −) of the drying operation in one kiln with Cyclspray over or under that in one kiln without Cyclspray.

"Therefore, in the 9-months period, where there were 12 kilns operated for 9 months and one of those kilns had a

Plaintiff also submitted a computation by inclusive totals, with hours of steam supply (kiln hours) as the time element (Exhibit P–12), showing that under such Cyclspray, there were 108y (9 × 12) and 9x; and in the 15-months period, where there were 12 kilns operated for 15 months and six of those kilns had Cyclsprays, there were 180y (15 × 12) and 90x (15 × 6). In consequence, during the entire 24-months period there were 99x (9 + 90), as the total differential value from the Cyclspray operation.

"Assume as before a differential value of $10.815 per M between the lumber before and after drying.

"Thus the respective total values of the drying operations for the two periods is the amount of lumber dried in each period, in M's multiplied by $10.815:

(10) $6,383.770$ M $\times \$10.815 = \$69,040.48$ value of drying operation in 9-months period.

(11) $15,502.909$ M $\times \$10.815 = \$167,663.96$ value of drying operation in 15-months period.

"From these figures a pair of simultaneous algebraic equations is obtained, as follows:

(12) $108y + 9x = \$69,040.48$

(13) $180y + 90x = \$167,663.96$

"Solving these simultaneous equations for x, we find that:

(14) $x = \$701.286$

"This is the differential value per month from the use of the Cyclspray; and is a positive value and not a negative value. That is, being a positive value, it shows a benefit or profit derived by the use of the Cyclspray.

"The value of x just given is the value of the use of one Cyclspray for one month—or in one Cyclspray-month.

"As there were 99 Cyclspray months, the total advantage from the use of the Cyclspray is

(15) $99 \times \$701.286 = \$69,427.31$

"This is the money value derived by the Mengel Body Company from its use of the Cyclspray equipment.

"Fourth Computation.

"Let w equal the capacity in board feet per month of the drying operation in one kiln without Cyclspray.

"Let v equal the differential advantage in board feet per month (+ or −) of the drying operation in one kiln with Cyclspray over or under that in one kiln without Cyclspray.

"Therefore, in the 9-months period, where there were 12 kilns operated for 9 months and one of those kilns had a Cyclspray, there were 108w (9 × 12) and

a theory it is entitled to the sum of $44,604.94.[2]

The former method (note 1 supra) uses months as the time element, while the latter (note 2 supra) uses kiln hours as the time element. Plaintiff insists that the former is more accurate and fair.

The master rejected these methods of computation and made use of the defendant's Theory of Comparative Efficiency, except as he modified it by his choice of factors, and in his main report, finds the gross benefit to the defendant to have been the sum of $10,451.38.[3]

---

9v; and in the 15-months' period, where there were 12 kilns operated for 15 months and 6 of those kilns had Cyclsprays, there were 180w (15 × 12) and 90v (15 × 6). In consequence, during the entire 24-months period there were 99v (9 + 90), as the total differential advantage in board feet from the Cyclspray operation.

"From these figures, and the total amounts of lumber dried in the respective periods as shown by the defendant's account, a pair of simultaneous algebraic equations is obtained, as follows:

(16) 108w + 9v = 6,383,770 board feet

(17) 180w + 90v = 15,502,909 board feet.

"Solving these simultaneous equations for v, we find that:

(18) v = 64,843.9 board feet.

"This is the differential advantage in board feet per month from the use of the Cyclspray; and is a positive value and not a negative value. That is, being a positive value, it shows a benefit or profit derived by the use of the Cyclspray.

"The value of v just obtained is the advantage in board feet derived from the use of one Cyclspray for one month— or in one Cyclspray-month.

"As there were 99 Cyclspray-months, the total advantage in board feet from the use of the Cyclspray is

(19) 99 × 64,843.9 = 6,419,546.1.

"This is the advantage in board feet per month derived by the Mengel Body Company from the use of the Cyclspray equipment.

"To obtain the value in money of this increased production, assume as before that the difference in value of the lumber before and after drying is $10.815 per M. Then

(20) 6,419.5461 × $10.815 = $69,427.39

"This is the money value derived by the Mengel Body Company from the use of the Cyclspray equipment."

[2] "Let y = Capacity 1 Kiln for 1 hour without Cyclspray

"Let x = Added Capacity of 1 Kiln for 1 hour due to Cyclspray

Then 51365y + 5849x = 6,383,770 feet lumber (1)

and 106492y + 57279x = 15,502,909 feet lumber (2)

To find Value of x multiply both sides of (1) by 2.071

Then 106402y + 12,113.28x = 13,220,787.67 (3)

106402y + 57,279x = 15,502.909 (4)

Subtracting (3) from (4) we have

45165.72x = 2,282.121.33

$$x = \frac{2,282.121.33}{45154.72}$$

x = 50.5277 feet added cap. 1 Kiln per 1 hr. with Cyclspray

Cyclspray Hours

Nine Months period 5849

15 Months period 57279

63128 × 50.5277 = 3,189,713 feet

Then 3,189.713 × $10.815 = $34.496.75

"In addition to the above benefit there is a benefit from the reduction in hourly operating cost in the 15 month period over the 9 month period as follows:—

$$\frac{\$24,868.00}{51365} = \$0.484$$

$$\frac{\$41,413.39}{106402} = \$0.389$$

$0.484—$0.389 = $0.095 × 106402 = $10,108.19

Then $34,496.75
$10,108.19
$44,604.94 Total benefit derived from use of Cyclspray."

[3] The master says: "In the absence of other evidence, however, I am of the opinion that this theory most accurately reflects the profits provided the various elements are properly used. These (aside from the superior quality of the Cyclspray-dried lumber which has already been considered) are as follows:

"1. Number of board feet dried: 'Board feet' means length × breadth × thickness (in inches). This is a factor which must be considered in determining the volume of work done by each machine.

"2. Thickness of lumber dried: Although included in 'board feet', thickness must also be considered as a separate factor. 'Dryability' depends upon the surface over which evaporation can take

place, and it requires more work to dry a piece of lumber four inches thick than two pieces of lumber each of which is two inches thick.

"3. Moisture content removed: The moisture content of lumber varies greatly. Substantially all but 5% of the moisture is removed. It therefore requires more work to remove the moisture from lumber having a high content than a low content; this factor must be considered.

"4. Texture of species of lumber: The species of lumber vary in their drying properties, i. e., more work is required to remove a given amount of moisture from one type than from another. This is therefore a factor to be considered in addition to the amount of moisture removed. It is so indefinite, however, as to be impractical and must be disregarded. An examination of the records does not show that any material 'Favoritism' was shown in this respect, but rather that substantially the same kinds of lumber were placed in all the machines.

"5. Drying time: Although the kilns did not operate to full capacity, lumber could not be dried in slack periods for use in the rush season; the time during which it was possible to operate the machines must for this purpose be considered as 100%, and the comparative drying time is a pertinent factor.

"6. 'Feet per Charge': Slats must be placed between the boards in the kilns to permit circulation of steam and hot air. Fewer are required for thick lumber than thin. A kiln can therefore dry more thick lumber than thin lumber in one operation. It is therefore a factor to be considered, and which properly should be credited to the machine drying thin lumber.

"7. Cost of drying: This element comprises the expense for steam, labor, depreciation, etc. and is not a factor to be considered in determining the comparative efficiency, but should be deducted from the gross profits computed upon this basis. It will be taken up later.

"I find it more fair to use the comparative efficiency of the machines during the Second Period than during the First when defendant was experimenting with the one Cyclspray in use. Upon this basis, these factors are as follows:

"Upon the above figures it appears that the Cyclsprays were 12.3462% more efficient than the Non-Cyclsprays; this means that in drying a given amount of lumber the six Cyclsprays would dry 52.-90709% of the whole and the six Non-Cyclsprays 47.09291%.

"From the defendant's records it appears that during the Second Period a total of 15,502,909 feet of lumber were dried by all twelve kilns. Upon the above basis, all conditions being equal, the machines would have dried the following amounts:

| | |
|---|---|
| Six Cyclspray | 8,202,138 feet |
| Six Non-Cyclspray | 7,300,771 feet |

| | |
|---|---|
| Excess of Cyclspray over Non-Cyclspray | 901,367 feet |

"During the First Period (when one Cyclspray and eleven Non-Cyclsprays were in use) the Cyclspray would have dried 9.266841% of the total drying and the Non-Cyclsprays 90.733159% upon the aforesaid basis of efficiency. The twelve kilns dried a total of 6,383,770 feet during this period. All things being equal they would have dried the following amounts:

| | |
|---|---|
| 11 Non-Cyclsprays | 5,792,196 feet |
| 1 Cyclspray | 591,574 feet |
| 1 Non-Cyclspray | 526,563 feet |

| | |
|---|---|
| Excess of 1 Cyclspray over 1 Non-Cyclspray | 65,011 feet |

"Therefore, during both Periods a total of

| | |
|---|---|
| Period I | 65,011 feet |
| Period II | 901,367 feet |
| | 966,378 feet |

were produced by Cyclsprays which could not have been produced by Non-Cyclsprays.

"As stated above, the kilns did not operate to capacity; during the First Period they ran only 66% of capacity, and during the Second Period 80%. In each period the defendant was forced to have some of its lumber dried by jobbers because the highly seasonable nature of the automobile business rendered

| | Cyclspray | Non-Cyclspray | Efficiency |
|---|---|---|---|
| Favorable Factors | | | |
| Board feet dried | 8,161,147 ft. | 7,341,762 ft. | 1.111606 |
| Average thickness | 1.8934 in. | 1.7930 in. | 1.055996 |
| Aggregate Moisture removed | 2883% | 2558% | 1.127052 |
| Unfavorable Factors | | | |
| Hours operated | 57,279 hrs. | 49,123 hrs. | 1.166032 |
| Feet per charge | 49,763 ft. | 49,274 ft. | 1.009923 |

$$\text{Net factor} \qquad \frac{1.111606 \times 1.055996 \times 1.127052}{1.166032 \times 1.009923} = 1.123462$$

The master further finds that the excess operating costs of the Cyclsprays for both periods amounted to $4,235.15 [4] and concludes that the net benefits to the defendant amounted to the sum of $6,216.23.

The master's calculations of the amount to be deducted for the excess cost of operation of Cyclspray over the cost of Non-Cyclspray seem to be covered as shown in the master's report (pp. 12, 13, note 4, supra), but the deduction should be made from the figure resulting from actual operations and not from a figure based on theoretic efficiency calculations.

I cannot agree with his use of these efficiency factors (report p. 10, see note 3), such as moisture removed, average thickness, etc., because the price of custom drying can be used as a standard cost per foot regardless of the moisture removed, average thickness, etc., factors. This price ($10.815 per M) included all such factors.

On page 11 of his report the master begins to deviate from facts and anticipates conclusions from certain assumptions. It is purely a coincidence that his figures so nearly approach the calculations of actual operations.

I agree with his finding that lumber drying is but one factor in the profit and loss of the entire business, and that the presentation of the profit and loss statement of the business would throw no light on the benefits or losses resulting from Cyclspray uses. I likewise agree with the master that there can be no calculation of the financial benefit due to the improved quality of the lumber because no real evidence supports any such calculation.

The question before the court resolves itself wholly into an inquiry as to the benefits derived by the defendant through the use of the device which this court has held to be an infringement.

---

their own equipment inadequate at certain times; although the kilns might lie idle part of the time the demand would be greater than their maximum capacity at other times. Furthermore, it was not possible to dry large quantities of lumber in slack periods for use in the rush seasons because of storage difficulties, etc. In the absence of other evidence I find that the defendant would have been forced to have the entire amount of 966,378 feet dried by jobbers if it had not used Cyclsprays.

"It is agreed by counsel that this drying would have cost the defendant $10.-815 per thousand feet of lumber dried. The gross amount saved by the defendant through the use of Cyclsprays was, therefore, $10,451.38." (Master's report, pp. 8, 9, 10, 11, and 12).

[4] "Period I

1 Cyclspray vs. 1 Non-Cyclspray

| | | |
|---|---|---|
| Steam | $1,918.16 | $1,196.94 |
| Labor | 173.87 | 139.65 |
| Depreciation | 311.81 | 286.16 |
| Total for Period I | $2,403.84 | $1,622.75 |

"Period II

6 Cyclsprays vs. 6 Non-Cyclsprays

| | | |
|---|---|---|
| Steam | $11,466.99 | $8,674.37 |
| Labor | 2,362.81 | 2,026.33 |
| Depreciation | 4,275.02 | 3,950.06 |
| Total for Period II | 18,104.82 | 14,650.76 |
| Total for Period I | 2,403.84 | 1,622.75 |
| Cost of Cyclsprays for both periods | 20,508.66 | 16,273.51 |
| Cost of Non-Cyclsprays for both periods | 16,273.51 | |
| Increase in operating cost due to Cyclspray | $4,235.15" | |

The following table shows figures culled from the record and master's report which are relevant to the problem.

dried 8,161,147 board feet and six Non-Cyclsprays which dried 7,341,762 board feet. During this period the cost of op-

Period I (Nine months)

| | Dried ea. per mo. (bd. ft.) | Dried ea. per 9 mo. (bd. ft.) | Total dried by all in 9 mo. (bd. ft.) | Operating cost ea. in 9 mo. | % of capacity |
|---|---|---|---|---|---|
| 1 Cyclspray | 78,775 | 708,976 | 708,976 | $2,403.84 | 66% |
| 11 Non-Cyclsprays | 57,321 | 515,890 | 5,674,794 | 1,622.75 | 66% |
| Total bd. ft. dried by all in Period I | | | 6,383,770 | | |

Period II (Fifteen months)

| | Ea. Per month | Ea. 15 months | Total 15 months | Ea. 15 months | % of capacity |
|---|---|---|---|---|---|
| 6 Cyclsprays | 90,735 | 544,409 | 8,161,147 | $3,017.47 | 83% |
| 6 Non-Cyclsprays | 81,575 | 489,451 | 7,341,762 | 2,441.793 | 83% |
| Total bd. ft. dried by all in Period II | | | 15,502,909 | | |

Thus, the problem may be stated as follows:

A manufacturer operated his drying kiln for two periods. During the first period he used one Cyclspray which dried 708,976 board feet and eleven Non-Cyclsprays which dried 5,674,794 board feet (an average of 515,890 board feet each). During this period the cost of operating one Cyclspray was $2,403.84 and the cost of operating one Non-Cyclspray was $1,622.75. The kilns were operated 66 per cent. of capacity during this period.

During the second period (fifteen months) he used six Cyclsprays which

erating six Cyclsprays was $18,104.82 and the cost of operating six Non-Cyclsprays was $14,650.76. The kilns were operated 83 per cent. of capacity during this period.

It was the manufacturer's usual practice to pay $10.815 per thousand board feet for custom drying of lumber he required in excess of his own drying capacity.

How much net benefit does he obtain by the use of Cyclsprays compared with using Non-Cyclsprays?

The answer is $6,714.72

Or
During Period I (Nine months)

| | Board feet | Board feet |
|---|---|---|
| One infringing machine dried...................................... | 708,976 | |
| One non-infringing machine dried (1/11 of 5,674,794)........... | 515,890 | |
| Excess production from one infringing machine.................... | | 193,086 |

During Period II (Fifteen months)

| | Board feet | Board feet |
|---|---|---|
| Six infringing machines dried.................................. | 8,161,147 | |
| Six non-infringing machines dried.............................. | 7,341,762 | |
| Excess production from using six infringing machines............ | | 819,385 |
| Total excess board footage obtained from use of infringing machines | | 1,012,471 |
| Gross benefit valued at $10.815 per thousand bd. ft............... | | $10,949.87 |
| Less extra cost of production (note 4)........................... | | 4,235.15 |
| Net benefit ................................................ | | $ 6,714.72 |

All of the calculations based on so-called "efficiency factors," "doctrines of comparison by inclusive totals," and "theories of expectancy" are fallacious. Computations involving factors of efficiency relative to the physical properties of the lumber dried have no place in this case because it is an agreed fact that custom drying was available and utilized for drying lumber at the rate of $10.815 per thousand feet regardless of the thickness, moisture content, texture, kiln load, steam cost, depreciation, or any other factors. Further, the two periods under discussion have been shown to have been characterized by wide differences of production, hours of operation, boiler capacity, and steam consumption. These differences have been shown to be due not only to the use of Cyclsprays, but to other factors as well. It is therefore incorrect to calculate benefits by comparing the second period with the first one. The correct "doctrine of comparison" is to compare the two sets of kilns during the same infringing period and under the same operating conditions as to actual production and costs. Any theory is fallacious which is based on assumptions that the production during the second period would be the same as during the first period, and that the increased production in the second period was entirely due to the increased use of Cyclspray, and that all other conditions were the same. They clearly were not. The fact that operating costs per month were nearly identical during the two periods is simply a coincidence.

These fallacies creep into plaintiff's calculations when it compares expected footage in the second period with actual footage of the first period, thus obtaining apparent excess footage to an amount which, multiplied by the cost of "outside drying" of $10,815, results in the claimed benefits of $69,427.36.

The following computation demonstrates the fallacy:

## Cyclspray.

Applying the same formula to production of Cyclspray, each one exceeded expected production by 178,577 board feet. This would seem to show that each Non-Cyclspray produced more efficiently than the Cyclsprays during the second period to the extent of 185,233 board feet or for six machines 1,111.398 board feet, which at $10.815 per thousand board feet would total $12,019.77 of "Inefficiency," to which would have to be added extra cost.

The court has carefully considered these theories and assumptions both individually and in relation to one another and has rejected all theories and assumptions in favor of the facts in evidence. There can be no question but that the defendant, spurred on by the additional cost of "custom drying," used every available means to increase his lumber drying capacity. The figures here show the contribution toward these efforts by the infringing machine and the monetary value of those benefits.

These figures are just what it succeeded in doing, not what it could have done or what it would have been expected to do.

One of the most pertinent of the agreed facts is that custom drying was available and utilized for the drying of lumber at the rate of $10.815 per thousand board feet, regardless of thickness, moisture content, or any other physical characteristic. The mutual acceptance of this fact compels the rejection as immaterial of all the calculations submitted which involve these factors, such as moisture and thickness, and greatly simplifies the procedure in reaching a conclusion.

Defendant did dry more lumber in infringing kilns than in noninfringing kilns, and as it was using every effort toward maximum capacity, the measure of its ben-

### Non-Cyclspray.

Eleven Non-Cyclsprays did produce in 9 months......5,674,794 bd. ft.
or an average for one Non-Cyclspray in 9 months...... 515.890 ”  ”
or six Non-Cyclsprays did produce in 9 months........3,095,340 ”  ”

At the same rate of production for 15 months expected production would be

$$15/9 \times 3,095,340 = 5,158,900$$
actual production was...................7,341,762

or an excess (?) production of..........2,182,862 for 6 Non-Cyclsprays for the second period or an average for one Non-Cyclspray of excess production of......363,810 bd. ft.

efits is the excess board footage that was dried by infringing kilns, priced at the cost of custom drying, less the increased cost of production due to the use of the infringing appliances.

Plaintiff's method cannot be sound, for it takes as a base the production of the first period working at 66 per cent. of available hours from which it builds up an expectancy production for the second period and concludes that all of the benefits of the excess production of the second period working at 83 per cent. of available hours is to be credited entirely to the use of five additional machines even though it does not admit the deduction of the greater operating cost of the infringing machine. Actually, the comparison between the infringing machines and noninfringing machines must be made within the same periods when production and conditions were similar.

No discussion of the master's supplementary report is necessary under the conclusions reached in this memorandum.

Therefore, the exceptions of both plaintiff and defendant will be overruled. So much of the report of the master as is consistent with the facts and reasoning herein stated will be affirmed, and such as is inconsistent will be disapproved and a decree will accordingly be so entered, providing for damages to the plaintiff in the sum of $6,714.72, with costs to be paid by the defendant.

There has been an argument via mail concerning the date from which interest shall run. I do not see that the instant case presents a situation so glaring that I should depart from the usual rule that it should run from the date of the master's report.

In view of the clerk's file stamp on the same, viz., January 19, 1934, there may be some confusion as to the actual date. The last-mentioned date is obviously an error, as a letter of correction by the master, attached to the report, and now filed therewith, is dated June 29, 1933, and refers therein to the fact that he filed the report on June 21. Further, the plaintiff's and defendant's exceptions were filed July 10, 1933. These could not have been filed prior to the submission of the report of the master. Interest will therefore run from June 21, 1933.